IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:18cr48 (MHL) |
| | ) | |
| JOHN JASON MORGAN, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter comes before the Court on Defendant John Jason Morgan's ("Defendant")

Motion to Suppress Evidence and Statements ("Motion to Suppress") (ECF No. 6), after having

been referred to the undersigned by United States District Judge M. Hannah Lauck. (ECF No.

7.) Because the Government has abandoned the use of Defendant's statements, Defendant

focuses his attack on the introduction of drugs seized from his pocket and those drugs and

additional items seized from his truck. Defendant challenges his initial encounter with police,

arguing that the police officers lacked reasonable suspicion to temporarily detain him.

Defendant also argues that the officers lacked probable cause to search his truck without a

warrant, and he challenges the validity of the search warrant that the officers eventually obtained.

Consequently, Defendant seeks suppression of the evidence obtained during those searches. For

the following reasons, the Court recommends that Defendant's Motion to Suppress (ECF No. 6)

be GRANTED IN PART and DENIED IN PART.

### I.    PROCEDURAL HISTORY

In 2007, Defendant pled guilty in this Court to one count of conspiracy to possess with

the intent to distribute and distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a) and

841(b)(1)(A)(viii).  *United States v. Morgan*, No. 3:06cv494-01 (MHL) (ECF No. 69) (E.D. Va.

Sept. 11, 2007).  After his incarceration, Defendant began a five-year period of supervised

release on November 5, 2014.  *Morgan*, No. 3:06cv494-01 (ECF No. 126 at 2).  Relevant to the

instant motion, on August 18, 2017, a United States Probation Officer filed a Second Addendum

to Petition on Supervised Release (the "Second Addendum"), alleging that Defendant had

violated the terms of his supervision by (1) failing to satisfactorily complete a drug treatment

program and (2) failing to report to the Probation Officer as directed.  *Morgan*, No. 3:06cv494-

01 (ECF No. 140).  That same day, based on the Second Addendum, this Court issued a warrant

for Defendant's arrest.  *Morgan*, No. 3:06cv494-01 (MHL) (ECF No. 141).

The events at issue in Defendant's Motion to Suppress occurred on September 22, 2017,

when members of the Richmond Police Department learned that Defendant had an outstanding

arrest warrant, took Defendant into custody and recovered the evidence at issue here.  On May

17, 2018, Judge Lauck referred the Motion to Suppress to the undersigned for a report and

recommendation.  (ECF No. 7.)  In his Motion, Defendant challenges three searches:  (1) the

search of his pants pocket incident to his arrest that yielded approximately 4.5 grams of

methamphetamine including packaging and a rolled up piece of paper currency; (2) the

warrantless search of Defendant's truck during which the police officers found but did not

confiscate a straw; and, (3) the search of Defendant's truck and the safe therein pursuant to a

warrant issued by a state magistrate in the City of Richmond that yielded — as relevant to the

Motion to Suppress — $145 in currency, approximately 19.38 grams of methamphetamine,

approximately 1.9642 grams of cocaine including packaging, two hydrmorphone pills,

approximately 0.1779 grams of heroin (including packaging), small empty baggies, two scales,

drug paraphernalia and documents belonging to Defendant.  (Mot. to Suppress at 13-19; Stip.

2

Regarding Evid. Def. Seeks to Suppress ("Stipulations") (ECF No. 18) at 1-2.) Defendant seeks to suppress all of this physical evidence.

Defendant also sought to suppress the statements that he made to the police officers on September 22, 2017, as well as certain electronic devices (i.e., cell phones and laptops) and their contents. (Mot. to Suppress at 11-14, 19-24.) However, the Government has agreed to the suppression of this evidence. (Suppression Hearing Transcript ("Tr.") (ECF No. 14) at 5-7, 11; Resp. of the United States to Def.'s Mot. to Suppress ("Gov't's Resp.") (ECF No. 9) at 13-14.) Therefore, the Court recommends that Defendant's Motion to Suppress be GRANTED to the extent that it seeks to exclude Defendant's statements and the electronic devices recovered from Defendant's truck. As to the physical evidence at issue, the Court recommends that Defendant's Motion to Suppress be DENIED for the reasons that follow.

## II.    FACTUAL BACKGROUND

On June 1, 2018, the Court conducted an evidentiary hearing on Defendant's Motion to Suppress. During the hearing, the three officers on the scene — John Douglas, Jonathan Myers and Steven Eacho — testified as to the events leading up to Defendant's arrest and the subsequent searches of his person and truck on September 22 and 23, 2017. (Tr. at 12-139.) The Government introduced the search warrant that the officers relied upon to search Defendant's truck as Government Exhibit 1. Defendant introduced the body camera footage for each of the officers as Defense Exhibits 1 and 2.[1]

_____

[1]      Defense Exhibit 1 consists of a video file titled Pwid_Meth.mp4 ("Officer Eacho File") that contains Officer Eacho's body camera footage. (Tr. at 9; Suppl. Info. Regarding Body Wire Camera Videos ("Video Suppl.") (ECF No. 12) at 1.) Defense Exhibit 2 contains five (5) video files — Morgan_Arrest.mp4 ("Officer Myers File") that contains Officer Myers' body camera footage; and Meth_Bust-file 4.mp4 ("Officer Douglas File 1"), Meth_Bust-file 3.mp4 ("Officer Douglas File 2"), Meth_Bust-file 2.mp4 ("Officer Douglas File 3") and Meth_Bust.mp4 ("Officer Douglas File 4") that chronologically contain Officer Douglas' body camera footage.

While the body camera footage of Officers Myers and Eacho appears to include timestamps in Zulu time — the Universal Coordinated Time often used by the military — Officer Douglas' body camera footage contains no such timestamp.  Therefore, during the suppression hearing, the Court and the parties agreed to reference the time on the time bar displayed at the bottom of each video.  For efficiency sake, the Court viewed the entirety of the body camera footage files before the hearing to avoid playing the full videos during the hearing.  However, the video files are in evidence in their entirety, and thus the Court may cite to any portion of those files.

After the hearing, the parties entered into stipulations (ECF No. 18) that set forth when the various searches occurred and what items were discovered and/or recovered during those searches.  Having heard the officers' testimony, the undersigned finds all three police officers credible.  Based on their testimony, and the evidence admitted during the hearing, the Court finds the following facts.

On September 22, 2017, Officers Douglas, Myers and Eacho rode together in a marked police car, patrolling Jefferson Davis Highway — a corridor known to the officers as a high-crime area for prostitution and drug trafficking.  (Tr. at 12-13, 16-17, 77.)  The officers were assigned to a focus mission team ("FMT") that involved making prostitution arrests, among other responsibilities.  (Tr. at 76-77.)  As they traveled northbound on Jefferson Davis Highway, Officers Myers and Eacho saw a woman run in front of traffic across the six-lane highway to a white pickup truck located in the parking lot of a Grab N Go convenience store on the other side of the road.  (Tr. at 13-14, 77-78, 122.)  Officer Myers had seen the same woman walking on Jefferson Davis Highway on previous occasions.  (Tr. at 83, 104-05.)  The woman then

---

(Tr. at 9-10; Video Suppl. at 1.)  To avoid confusion, the Court will cite to these videos by officer, not by file name.

approached the truck driver — Defendant — and stood at the passenger side of the truck in a manner consistent with the solicitation of prostitution. (Tr. at 83.)

The officers pulled into the Grab N Go parking lot, got out of the police cruiser and spoke with the woman. (Tr. at 68-69.) She told the officers that she lived in Prince George but came to Richmond to visit friends. (Tr. at 20, 69.) She admitted to taking Tramadol earlier that day for back pain. (Officer Douglas File 1 at 00:37-00:39, 02:09-02:24.) While she claimed that she used to have a prescription for the pills, she no longer did. (Officer Douglas File 1 at 02:16-02:24.) She stated that she did not know Defendant, and she denied any attempt to engage in prostitution. (Officer Douglas File 1 at 01:25-01:35.) The woman said that she ran over to Defendant's truck, because he whistled at her and other men in the area had scared her. (Tr. at 68-69; Officer Myers File at 00:31-00:42.)

Around this same time, an unidentified man who had been standing near the bed of the truck walked away from the scene. (Officer Eacho File at 00:23-00:53.) Defendant — the only occupant in the truck — sat in the driver seat talking on his cell phone. (Tr. at 22, 57, 82, 103-04.) The officers did not tell Defendant that he could not leave, nor did they make an effort to prevent him from doing so. (Tr. at 21-22, 82.)

After the officers spoke with the woman, Officer Myers walked over to the truck. (Tr. at 82-83; Officer Myers File at 00:00-01:29.) Officer Myers asked whether Defendant would speak with him. (Officer Myers File at 01:27-01:31.) After Defendant had finished his phone call, Officer Myers requested his identification. (Officer Myers File at 01:31-02:24.) Officer Eacho ran Defendant's information, and they learned that he had an outstanding federal arrest warrant for a probation violation. (Tr. at 85; Officer Eacho File at 06:17-06:45.) The officers then

ordered Defendant to step out of the truck, handcuffed him and temporarily detained him pending confirmation of the warrant. (Tr. at 23-24, 85-86; Officer Myers File at 05:48-30:12.)

While awaiting confirmation, the officers asked Defendant several questions without reading him *Miranda* warnings. Defendant discussed his drug conviction and usage. Though Defendant claimed that he did not know about the outstanding warrant, he admitted twice that he failed to complete a drug treatment program at the Healing Place as part of his probation. (Officer Myers File at 10:00-10:20; Officer Eacho File at 18:13-18:46.) He told the officers that he was in the program to treat his methamphetamine use. (Officer Myers File at 10:20-10:27.) He denied having any drugs in his truck. (Officer Myers File at 10:28-10:30.) When asked whether he continued to use methamphetamine, Defendant responded, "Occasionally." (Officer Myers File at 10:54-11:00.) Defendant claimed that he had used twice during his probation. (Officer Myers File at 11:05-11:09.) He later stated that he hoped there was not anything in the truck, preemptively blaming the "girl that [he] date[d]" who used "dope" and was "reckless with everything" if the truck contained any contraband. (Officer Myers File at 12:35-13:10.)

Defendant explained that his probation stemmed from a charge in 2006 for conspiracy to distribute methamphetamine. (Officer Eacho File at 17:55-18:12.) He stated that he incurred a federal charge, because the drugs came through the mail across state lines. (Officer Eacho File at 26:26-26:48.) Likewise, Defendant would send payment for the methamphetamine by mail. (Officer Eacho File at 27:40-27:45.) He told the officers that an ounce of methamphetamine could sell for "almost anything" — from $300 to $400 in states like Texas up to $1,500 to $2,000 along Jefferson Davis Highway. (Officer Myers File at 26:40-27:49.) Defendant said that one uses methamphetamine by sniffing it. (Officer Myers File at 28:05-28:10.) He described methamphetamine as coming in a "rock form," "solid" and "like a crystal" that you then crush

6

up. (Officer Myers File at 28:20-28:31.) He stated that he thought users could also smoke methamphetamine. (Officer Myers File at 28:40-28:42.) When Officer Myers asked whether using a gram of methamphetamine at once would be typical or deadly, Defendant responded that it would not "be good." (Officer Myers File at 28:49-28:54.) Defendant estimated that one user could use a quarter of a gram "numerous times." (Officer Myers File at 28:54-29:13.)

Defendant indicated that he worked as a roofer, and he needed to get to his job site. (Tr. at 34; Officer Myers File at 07:04-07:08.) He realized that his "buddy" had left, and he indicated that he had hoped to give him instructions. (Officer Myers File at 08:00-08:15.) He even asked if he could call someone to come and pick up his truck. (Officer Myers File at 08:39-08:41.) At one point, Officer Douglas noted another man passing by multiple times and videotaping the scene. (Officer Douglas File 1 at 28:11-28:24.)

Once the officers received confirmation of Defendant's outstanding warrant, they arrested him and searched his person incident to arrest. (Officer Douglas File 2 at 00:16-05:52.) Officer Douglas pulled a baggie of methamphetamine out of the right watch pocket of Defendant's jeans. (Officer Douglas File 2 at 02:39-02:53.) When Officer Douglas asked how much methamphetamine the baggie contained, Defendant estimated the weight at a "couple grams." (Officer Douglas File 2 at 03:05-03:10.) Officer Douglas then read Defendant his *Miranda* warnings. (Officer Douglas File 2 at 03:14-03:24.) The officers then continued to question Defendant.

During this time, some men nearby tried to speak to Defendant. (Officer Myers File at 33:02-33:10.) Officer Myers indicated that Defendant could not talk with them at the moment, and that they could not take his truck at that time. (Officer Myers File at 33:02-33:55.) Officer Douglas asked Defendant to identify the men. (Officer Douglas File 2 at 04:20-04:24.)

Defendant stated that they lived nearby and that one of them was a neighbor to one of his friends. (Officer Douglas File 2 at 04:25-04:43.) Officer Douglas also found a rolled up dollar bill as well as additional folded money in Defendant's pants pockets. (Tr. at 26-27; Officer Douglas File 2 at 04:27-04:35.) Officer Douglas asked about the purpose of the rolled bill, and Defendant eventually stated that he used methamphetamine by sniffing it. (Officer Douglas File 2 at 04:34-05:12.)

After the officers discovered the methamphetamine on Defendant's person, they believed that they had probable cause to search the truck for evidence of distribution. (Tr. at 36, 39-40, 89-91, 93.) By then, Defendant had said that his probation followed a federal methamphetamine distribution conspiracy conviction, and that he continued to use the drug himself. (Tr. at 35-36, 87.) Defendant appeared very nervous, showed great concern about his truck, and several people had come to the parking lot trying to take the truck away — behaviors that the officers found consistent with drug distributors. (Tr. at 37-38, 40, 87, 91-92.) While the officers did not have prior personal experience with methamphetamine — only training — Defendant had made statements about how to use the drug and explained that a quarter of a gram satisfied a typical user multiple times. (Tr. at 40-41, 61-62, 89, 102-03, 134; Officer Myers File at 28:54-29:13.) Then, Defendant estimated that the methamphetamine pulled from his pocket weighed a couple of grams. (Tr. at 128-29; Officer Douglas File 2 at 03:05-03:10.) Also, Defendant had been the sole occupant of the truck. (Tr. at 91.) Although the officers had not seen any contraband in plain view inside the truck, finding the methamphetamine in Defendant's pocket made them believe that they had probable cause to search it. (Tr. at 39-40.)

As the officers searched the truck, they saw multiple laptops, cell phones and SIM cards or jump drives. (Tr. at 46-47, 50, 95.) Based on their experience, they considered these

8

electronic devices as further indicia of distribution.  (Tr. at 50-51, 94.)  The officers also came

upon a locked safe in the backseat area of the truck.  (Tr. at 43-44, 95.)  Because the officers did

not know whether they could legally search the locked safe without a warrant, they decided at

that time to end the search to obtain one.  (Tr. at 45-46, 95-99.)

Officer Eacho served as the affiant for the search warrant, and Officer Myers reviewed it.

(Tr. at 109-10, 126-27; Gov't Ex. 1 at 1, 3-6.)  When Officer Eacho initially presented a typed

affidavit, the state magistrate said that it lacked sufficient facts to support a probable cause

determination for possession with intent to distribute.  (Tr. at 127-28.)  Therefore, Officer Eacho

handwrote the following:

> Morgan made statements about the weight being inconsistent with personal use.
> The package was [sic] weighted after being seized and [sic] weighted
> approximately 4gm.  Morgan stated that a typical user will use about a quarter of
> a gram at one time.  In my experience, any person using any sched. I or II
> substance does not hoard such substance in this amount.  Morgan was also in
> possession of between $200.00 and $400.00.  This is also inconsistent with a user,
> due to the fact that the narcotics being used are highly addictive.  Most users will
> use every dollar earned to purchase small amounts of the drug and use it
> immediately.

(Gov't Ex. 1 at 5.)  Officer Eacho then initialed the handwritten portion.  (Tr. at 127.)  With this

additional information included in the affidavit, the magistrate approved the search warrant.

(Gov't Ex. 1 at 1, 3-4.)

On September 23, 2017, Officers Douglas and Myers executed the warrant, and their

search recovered: "two computers with bags, multiple hard drives and digital storage devices,

one safe with suspected narcotics and other items that the officers associated with drug

distribution, $145 in currency from a wallet, and one cell phone from Mr. Morgan's truck."  (Tr.

at 131; Gov't Ex. 1 at 2; Stipulations at 1.)  The safe contained:  approximately 19.38 grams of

methamphetamine, approximately 1.9642 grams of cocaine including packaging, two

hydromorphone pills, approximately 0.1779 grams of heroin including packaging, small empty baggies, two scales, drug paraphernalia and documents belonging to Defendant. (Stipulations at 1-2.) Defendant now seeks to suppress that physical evidence. (Mot. to Suppress at 13-19.)

### III.   ANALYSIS

Defendant initially alleges that the police officers lacked reasonable, articulable suspicion to initiate their encounter with Defendant pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). (Mot. to Suppress at 7-8; Def.'s Reply to Resp. to Mot. to Suppress ("Def.'s Reply") (ECF No. 17) at 3-5.) The Government responds that the officers initially engaged Defendant in a consensual encounter that did not implicate the Fourth Amendment. (Gov't's Resp. at 9-10; Post-Hearing Arg. of the United States in Opp'n to Def.'s Mot. to Suppress ("Gov't's Suppl.") (ECF No. 16) at 6-7.) Alternatively, the Government argues that the officers had reasonable suspicion to believe that Defendant had attempted to solicit prostitution sufficient to support a *Terry* stop. (Gov't's Resp. at 9-10; Gov't's Suppl. at 6-7.)

### A. Defendant's Initial Encounter with Officer Myers.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, "searches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

However, not every police-citizen encounter receives Fourth Amendment scrutiny. *United States v. Jones*, 678 F.3d 293, 298-99 (4th Cir. 2012). Courts have long-accepted that "a seizure does not occur simply because a police officer approaches an individual and asks a few

questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). When "a reasonable person would feel free 'to disregard the police and go about his business' . . . , the encounter is consensual and no reasonable suspicion is required." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Thus, law enforcement officers "may generally ask questions . . . [and] ask to examine [an] individual's identification" even when they "have no basis for suspecting [that] particular individual." *Id.* at 434-35 (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984)) (additional citations omitted).

To determine whether a reasonable person would "feel free to go," courts examine the totality of the circumstances. *United States v. Meikle*, 407 F.3d 670, 672-73 (4th Cir. 2005) (quoting *United States v. Weaver*, 282 F.3d 302, 309-10 (4th Cir. 2002)). Factors that inform this inquiry include:

> the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement; whether the officers' questioning was non-threatening; and whether they treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter as "routine" in nature.'

*Jones*, 678 F.3d at 299-300 (quoting *United States v. Gray*, 883 F.2d 320, 322-23 (4th Cir. 1989)). While approaching a person and asking to see his identification does not automatically convert a consensual encounter into a seizure, retention of a driver's license or other form of identification "is highly material under the totality of the circumstances analysis." *Weaver*, 282 F.3d at 310.

In *Jones*, two uniformed police officers "conspicuously" followed a vehicle onto private property — simply because it had out-of-state tags and drove in a high-crime area — and then effectively blocked the vehicle with the police cruiser. 678 F.3d at 300, 304 n.6. The passengers walked away, and the officers focused immediately on the driver, Jones. *Id.* at 303. Moreover,

the officers did not ask to speak with Jones. *Id.* Instead, the officers immediately asked Jones to lift his shirt and consent to a pat down search for weapons. *Id.* Finding that these circumstances rose to the level of a detention or seizure, the Fourth Circuit found several factors particularly salient. *Id.* at 300-05.

First, Jones knew that the officers had been following him, as opposed to police officers approaching a citizen seemingly at random. *Id.* at 300. Second, the officers "effectively block[ed] Jones from moving his vehicle," which the court found to erode the narrative of a "seemingly routine approach of [a] police officer." *Id.* at 300-01. The officers had not "merely 'come upon an already parked car.'" *Id.* at 302 (quoting *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994)). Instead, the Fourth Circuit found that blocking an individual's car from leaving "demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation." *Id.* at 302. Third, the officers did not ask to speak with Jones, as would be "the routine practice of officers seeking to engage in a consensual encounter." *Id.* at 303. Rather, the officers continued asserting their authority by immediately asking Jones to lift his shirt and then to consent to a pat down for weapons. *Id.* at 303. Though the officers did not draw their weapons or use a threatening tone, the Fourth Circuit concluded that "a reasonable person would not have felt free to walk away and ignore [the detective's] nearly immediate 'requests.'" *Id.* at 303, 305. Finally, the Fourth Circuit acknowledged the fact intensive nature of the inquiry, stating that any one fact on its own might not turn a consensual encounter into a detention or seizure. *Id.* at 305.

Here, the officers' initial interaction with Defendant began as a consensual encounter. The three uniformed police officers — in a marked police car — pulled into the Grab N Go parking lot where Defendant had already parked his truck. (Tr. at 51-53.) As part of the FMT,

12

the police officers patrolled a section of Jefferson Davis Highway that one officer described as a "very prominent area for prostitution." (Tr. at 76-77.) Unlike Jones, who knew that the police had followed him, Defendant was already parked in a parking lot when the officers approached. (Tr. at 78); 678 F.3d at 300. In contrast to the officers in *Jones*, the officers here did not block Defendant's truck with the parked police car. (Tr. at 82); 678 F.3d at 300-01. Nor did they draw their weapons, stand in front of the truck or direct Defendant to turn off the engine. (Tr. at 22, 82, 116.) Upon arrival, all three officers concentrated their attention on the woman who Officers Myers and Eacho saw run across Jefferson Davis Highway. (Tr. at 77-78, 122.) Indeed, an unidentified man standing beside the bed of Defendant's truck walked away, and none of the officers stopped him. (Tr. at 54-55; Officer Eacho File at 00:23-00:53.) Only after all three officers had engaged with the woman for nearly two minutes did Officer Myers, by himself, first walk over to talk to Defendant. (Officer Douglas File 1 at 00:25-02:24; Officer Myers File at 00:00-01:22.)

Upon first approach, Officer Myers asked Defendant how he was doing and whether he could speak with Defendant "real quick." (Officer Myers File at 01:27-01:31.) *See Jones*, 678 F.3d at 303 (noting this inquiry as the "routine practice" of officers attempting to engage in consensual encounters on foot). Myers then waited more than thirty seconds — without saying anything else — for Defendant to finish his phone call. (Officer Myers File at 01:31-02:08.) Defendant's actions demonstrate that he felt free to continue talking on his cell phone. The police had not blocked his truck, the officers focused their attention on the woman, and the other man had walked away altogether without repercussion. These circumstances do not give rise to the show of authority present during the stop in *Jones*. Given the totality of the circumstances, a reasonable person in Defendant's position would have felt free to leave. Thus, the officers'

interaction with Defendant began as a consensual encounter, and did not implicate the Fourth Amendment.

Despite the consensual nature of their initial interaction, Officer Myers' encounter with Defendant transformed into a detention or seizure once Officer Myers walked away with Defendant's driver's license. After Defendant ended his phone call, Officer Myers asked him for identification, which Defendant produced. (Tr. at 82, 84; Officer Myers File at 02:21-02:24.) Officer Myers then asked Defendant why he had tried to solicit prostitution. (Officer Myers File at 02:25.) Officer Myers continued to talk with Defendant about prostitution, before walking back to the police cruiser with Defendant's driver's license. (Officer Myers File at 02:26-02:48.) As he walked away, Officer Myers said, "hang tight for me, Mr. Morgan." (Officer Myers File at 02:49-02:50.)

Taken together, these three things changed the interaction from a consensual encounter to an investigative stop. First, Officer Myers asked to see Defendant's identification. (Officer Myers File at 02:21-02:24.) While retention of a driver's license does not determine the totality of the circumstances, a reasonable person would not feel free to drive away without it. *See Weaver*, 282 F.3d at 311-12 (finding that a passenger on a bus "could legally go about his business without his driver's license").

Second, Officer Myers engaged Defendant in a series of questions and comments that clearly indicated Officer Myers' suspicion that Defendant had attempted to solicit prostitution. (Officer Myers File at 02:24-02:49.) Such inquiry into specific criminal activity could lead a reasonable person to believe that he was not free to ignore the officer's questions. *Jones*, 678 F.3d at 300 (noting whether police officers treated the defendant as though they suspected him of criminal activity as a relevant factor).

Third, as he walked away with Defendant's driver's license, Officer Myers instructed

Defendant to "hang tight." (Officer Myers File at 02:49-02:50.) In *United States v. Richardson*,

385 F.3d 625 (6th Cir. 2004), a traffic stop ended and the driver was free to leave when the

police officer handed the driver a citation and shook his hand. *Id.* at 629-30. However, the

police officer then asked a driver to "just hang out right here for me, okay?" *Id.* At that point,

the Sixth Circuit found that the officer's "words alone were enough to make a reasonable person

in [the driver's] shoes feel that he would not be free to walk away and ignore [the officer's]

request." *Id.* Here too, Officer Myers' instruction to "hang tight" while he ran Defendant's

driver's license, would lead a reasonable person in Defendant's shoes not to feel free to leave.

Thus, the consensual encounter became a seizure under the Fourth Amendment, and the Court

next turns to whether the police officers had reasonable suspicion to justify that seizure.

**B. The Police Officers Had Reasonable, Articulable Suspicion to Perform a Brief, Investigatory *Terry* Stop.**

A police officer may stop and briefly detain a person for investigative purposes where he

"observes unusual conduct which leads him to reasonably conclude in light of his experience that

criminal activity may be afoot . . . ." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). When the officer has

a "reasonable, articulable suspicion" of criminal activity, such a stop complies with the Fourth

Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The reasonable suspicion standard

requires less than probable cause or even preponderance of the evidence, but it demands "at least

a minimal objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490

U.S. 1, 7 (1989)).

As with consensual encounters, courts employ a totality of the circumstances test to

determine whether an investigatory detention or seizure has occurred. *United States v. Arvizu*,

534 U.S. 266, 273-74 (2002). Importantly, courts view all of the factors of a particular situation

"taken together" instead of isolating any one in a vacuum. *Id.* at 274-75 (citing *Terry*, 392 U.S. at 22 and *Sokolow*, 490 U.S. at 9).   Where an investigative stop has occurred, *Terry* commands a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Meikle*, 407 F.3d 670, 672 (4th Cir. 2005) (quoting *Terry*, 392 U.S. at 20).  Factors that, when considered as a whole, may contribute to reasonable suspicion include: presence in a high-crime area; nervous behavior; flight; and, walking past the same buildings multiple times. *Wardlow*, 528 U.S. at 124 (high-crime area and unprovoked flight — a type of "evasive behavior"); *Terry*, 392 U.S. at 6, 22-23 (officer became "thoroughly suspicious" that individuals walking past a store front, peering inside and repeating this behavior were planning to rob the store); *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977) (high-crime area, late at night and officer familiar with area did not recognize defendant).

Here, the police officers had reasonable suspicion to believe that Defendant had attempted to solicit prostitution from the woman that the officers also questioned.  As part of their work on the FMT, the officers knew that the Jefferson Davis Highway corridor had a reputation as a high-crime area for prostitution and drug-related offenses.  (Tr. at 12-13, 16-17, 77.)  Officers Myers and Eacho saw the woman run across six lanes of traffic — causing other motorists to slam on their brakes — to approach Defendant's car.  (Tr. at 77-78, 122.)  Officer Myers had seen the woman walking on Jefferson Davis Highway in the past.  (Tr. at 83, 104-05.)  Upon questioning, the woman provided answers that increased the officers' suspicion.  (Tr. at 68-69.)  For example, she stated that she did not live in the area, she did not know Defendant, and she ran over to his truck when she heard him whistle to her.  (Tr. at 68-69.)  Although the interaction between the woman and Defendant spanned at most a minute before the officers

arrived, Officer Douglas testified that, in his experience as an undercover officer, it took less than a minute to solicit prostitution. (Tr. at 58-59; Officer Douglas File 1 at 00:00-00:31; Officer Eacho File at 00:00-00:33.) Grounded in these articulable facts, the officers had reason to believe that Defendant had attempted to solicit prostitution from the woman when Officer Myers asked for his identification and temporarily retained it.[2]

With that reasonable suspicion, the police officers could conduct a brief stop of Defendant to further investigate. *Terry*, 392 U.S. at 30. Still, the officers' action must then reasonably relate to the circumstances that gave rise to the stop. *Meikle*, 407 F.3d at 672. In other words, the investigative stop "may last no longer than necessary to accomplish its purposes." *United States v. Ramirez-Jimenez*, 652 F. App'x 211, 214 (4th Cir. 2016) (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)).

Here, approximately three minutes passed from the time that Officer Myers told Defendant to "hang tight" to when Officer Myers learned of Defendant's outstanding arrest warrant, returned to the truck and ordered Defendant to step out. (Officer Myers File at 02:49-05:48.) Officer Myers testified that during any encounter where he suspects an individual of criminal activity, he asks for identification as part of the "field interview" to enter the individual's information into the police database and check to see whether the individual is wanted by police. (Tr. at 84-85.) The Fourth Circuit has well-accepted that asking for identification and running it through a computer check during a lawful detention constitutes "police diligence." *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012) (quoting *United*

---

[2]     Indeed, the basis for the officers' reasonable suspicion had already formed by the time that Officer Meyers first approached Defendant asking if they could talk. The officers already had familiarity with the high-crime area, saw the woman run through traffic to Defendant's truck, and heard her suspicious and evasive answers to their questions. Nonetheless, for the reasons stated above, the Court finds that Officer Myers first had a consensual encounter with Defendant.

*States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011)).  The police officers here took a

reasonable and brief amount of time to run Defendant's information after Officer Myers initially

detained him.

When the officers first learned of Defendant's outstanding warrant, they then had

reasonable, articulable suspicion to continue temporarily detaining Defendant while they

confirmed the validity of the warrant.  To that end, Officer Myers directed Defendant to exit the

truck on the driver's side.  (Officer Myers File at 05:48-05:52.)  Officer Douglas then handcuffed

Defendant and performed a pat down search for weapons.  (Officer Douglas File 1 at 07:03-

07:46.)  When Defendant pleaded with the officers that he needed to get to his work site, Officer

Douglas explained that they were awaiting confirmation of the warrant which, if confirmed,

would lead to a search of Defendant's person.  (Officer Douglas File 1 at 08:16-08:24.)  The

police officers did not search Defendant or his truck at that time.  Instead, they only peered into

Defendant's truck to see what, if anything, laid in plain view.  (Officer Douglas File 1 at 07:53-

08:05, 08:32-09:03, 09:15, 18:40; Officer Myers File at 17:05-18:17.)  Approximately twenty-

four minutes after placing Defendant in handcuffs, the officers received confirmation that the

warrant remained active and valid from the United States Marshals for Defendant's arrest.

(Officer Douglas File 1 at 07:03 through Officer Douglas File 2 at 00:16;[3] Officer Myers File at

06:00-30:12.)  Upon confirmation of the warrant, the officers had probable cause to arrest

Defendant.  The officers promptly arrested Defendant and searched his person incident to that

arrest, thereby ending his temporary detention under *Terry*.  (Officer Douglas File 2 at 00:16-

05:52.)

---

[3]       Officer Douglas' body camera footage is divided among four files, because the
manufacturer set up the camera to automatically create a new file after every thirty minutes of
continuous recording.  (Tr. at 42.)

The Government argues that even if the police officers lacked reasonable suspicion to temporarily detain Defendant, the attenuation doctrine under *Utah v. Strieff*, 136 S. Ct. 2056 (2016), supports the admissibility of the evidence obtained during the subsequent searches. (Gov't's Resp. at 8, 10-11; Gov't's Suppl. at 7-8.) Specifically, the Government claims that the valid outstanding arrest warrant constitutes an intervening circumstance that outweighs any unlawful conduct by the police officers in detaining Defendant for three minutes before receiving notification of the warrant. (Gov't's Resp. at 10.) Defendant distinguishes *Strieff*, arguing that the attenuation doctrine does not apply here, because the officers had no "bona fide investigation" into Defendant and instead merely pursued a fishing expedition. (Mot. to Suppress at 9-10; Def.'s Reply at 5-6.)

In *Strieff*, the Supreme Court held that the attenuation doctrine permits the admissibility of evidence obtained after "an unconstitutional detention le[d] to the discovery of a valid arrest warrant." 136 S. Ct. at 2060. There, while surveilling a house whose occupants the police suspected of dealing drugs, an officer detained Strieff after seeing him exit the home. *Id.* at 2059-60. The officer requested Strieff's identification, and he relayed Strieff's information to a dispatcher who confirmed that Strieff had an outstanding arrest warrant. *Id.* at 2060. The officer arrested Strieff pursuant to the warrant, and during the search incident to arrest, discovered a baggie of methamphetamine and other drug paraphernalia. *Id.* The prosecution conceded that the officer lacked reasonable suspicion to detain Strieff, but argued that "the existence of a valid arrest warrant attenuated the connection between the unlawful stop and the discovery of the contraband" such that the court should not suppress the drugs and drug paraphernalia. *Id.*

The Supreme Court agreed. In determining whether the attenuation doctrine applied, the Court employed a three-factor test, considering: (1) the "temporal proximity" between the

unconstitutional conduct and the discovery of the evidence; (2) "the presence of intervening circumstances;" and, (3) "particularly" examining "the purpose and flagrancy of the official misconduct." *Id.* at 2061-62 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

Applied to Strieff's case, the temporal proximity factor favored suppression, because "only minutes" separated the illegal stop and the discovery of drug evidence. *Id.* at 2062. Unless "substantial time" had passed, this factor favors suppression. *Id.* (noting that in *Brown*, the Court found that this factor still cut in favor of suppression when less than two hours had elapsed (citing *Brown*, 422 U.S. at 604)).

The second factor — the presence of intervening circumstances — "strongly favor[ed] the State." *Id.* The discovery of a pre-existing, unrelated, valid arrest warrant was "sufficiently attenuated to dissipate the taint" of the unlawful conduct. *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)). Indeed, upon discovery of the warrant, the officer "had an obligation to arrest Strieff." *Id.*

Likewise, the purpose and flagrancy of the official misconduct also strongly favored the State. *Id.* at 2063 (additional citations omitted). The Court found that the officer made two good-faith mistakes that were "at most negligent." *Id.* First, the officer only saw Strieff exit the house. *Id.* He did not see Strieff enter, and thus he had no "sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction." *Id.* Second, the officer should have asked Strieff to speak with him, instead of demanding it. *Id.* After the problematic stop, the Court reasoned that the officer acted lawfully by running a check of Strieff's information and then searching him incident to arrest. *Id.* The Court also saw "no indication that this unlawful stop was part of any systemic or recurrent police misconduct." *Id.*

Consequently, based on the three factors, the Court found the evidence "admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant." *Id.*

Here, assuming that the officers lacked reasonable suspicion to detain Defendant, the first factor favors suppression. Less than half an hour elapsed between Officer Myers walking away with Defendant's driver's license and the discovery of the baggie of methamphetamine in Defendant's pants pocket. (Officer Myers File at 02:49-32:20.) While more time elapsed here than the mere minutes in *Strieff*, even thirty minutes does not constitute "substantial time" to distance the official misconduct from the evidence discovery. *Strieff*, 136 S. Ct. at 2062; *see also Brown*, 422 U.S. at 604 (finding "less than two hours" insufficient to favor admissibility).

However, the second factor — the presence of intervening circumstances — strongly favors the Government here. While the police officers detained Defendant, they discovered the existence of an unrelated, pre-existing, valid outstanding warrant for his arrest — the exact intervening circumstance present in *Strieff*. 136 S. Ct. at 2062. Upon that discovery, the officers had an obligation to arrest Defendant. *Id.*

Finally, the third factor — the purpose and flagrancy of the official misconduct — also strongly favors the Government here. The police officers patrolled Jefferson Davis Highway on the day that they encountered Defendant with the purpose of drug interdiction and prostitution suppression in the area. (Tr. at 12-13, 76-77.) They observed the woman's behavior that — based on their training and experience — caused them to suspect her as a prostitute. (Tr. at 20-21.) Upon talking with the woman, the officers learned, *inter alia*, that Defendant had whistled at her, thereby prompting her to run across the highway to his truck. (Tr. at 69.) This led the officers to suspect that Defendant had attempted to solicit prostitution from the woman. (Tr. at 71.) Like the officer in *Strieff*, "[n]othing prevented [the officers] from approaching [Defendant]

simply to ask" about their suspicions. 136 S. Ct. at 2063 (citing *Bostick*, 501 U.S. 429, 434). Of course, Officer Myers could have continued to engage Defendant in consensual conversation for longer than he did. But his failure to do so at worst amounts to mere negligence, and it does not rise to the level of flagrant police misconduct that the exclusionary rule intends to deter. *See, e.g.*, *Kaupp v. Texas*, 528 U.S. 626, 628, 633 (2003) (per curiam) (finding flagrant conduct where police made a warrantless arrest in the arrestee's home after denial of a warrant and where some officers knew they lacked probable cause); *Wong Sun v. United States*, 371 U.S. 471, 474-75 (1963) (finding flagrant conduct when officers broke down the defendant's door, followed him into his bedroom and immediately arrested him).

Applying the three-factor test, the evidence that the officers discovered on Defendant's person during the lawful search incident to arrest "was sufficiently attenuated by the pre-existing arrest warrant." *Strieff*, 136 S. Ct. at 2063. While the temporal proximity factor weighs in Defendant's favor, as in *Strieff*, the other two factors strongly favoring the Government outweigh that consideration. Consequently, the attenuation doctrine offers another basis to deny Defendant's motion.

## C. Defendant's Arrest and Search Incident to Arrest.

While Defendant does not challenge the search of his person incident to arrest itself, he argues that the exclusionary rule mandates the suppression of the methamphetamine and rolled up paper currency found in his pants pocket after his allegedly unlawful seizure. (Mot. to Suppress at 11.)

However, as stated above, the officers did not search Defendant's person until they received confirmation of the active, outstanding warrant for his arrest. The officers lawfully arrested Defendant pursuant to the outstanding warrant. *See Strieff*, 136 S. Ct. at 2062 (finding

that once a police officer discovered a valid arrest warrant, the officer had an obligation to arrest the individual that he had detained).

Under the Fourth and Fourteenth Amendments, it is well-established that "an arresting officer may, without a warrant search a person validly arrested." *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) (citing *United States v. Robinson*, 414 U.S. 218 (1973)). Evidence obtained during a search incident to a valid arrest is admissible. *DeFillippo*, 443 U.S. at 36. The exclusionary rule exists to deter unconstitutional police conduct. *Id.* at 38 n.3. But here, the police officers had reasonable suspicion to detain Defendant. During that detention, the police officers confirmed Defendant's outstanding federal warrant, giving them probable cause to arrest him. Consequently, without a Fourth Amendment violation, the exclusionary rule does not apply to the fruits of this search.

### D. The Warrantless Search of Defendant's Truck.

Next, Defendant argues that the police officers lacked probable cause to search his truck in the parking lot of the Grab N Go without a warrant. (Mot. to Suppress at 14-16.) The Government asserts that the "automobile exception" to the Fourth Amendment's warrant requirement justified that search, because the officers had probable cause to believe that the truck contained evidence of criminal activity. (Gov't's Resp. at 15-16.) The Government also argues that under *Gant*, the officers could perform a warrantless search of Defendant's truck, because they had reasonable belief that the truck held more evidence of methamphetamine use, possession, manufacture and/or sale. (Gov't's Resp. at 16.)[4]

---

[4]    After the suppression hearing, the Court directed the parties to brief whether Defendant had a diminished expectation of privacy due to his probationary status and, if so, the impact of that diminished expectation on the Motion to Suppress. (ECF No. 13.) "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (quoting *Griffin v. Wisconsin*, 483 U.S.

Courts recognize the so-called "automobile exception" as another well-established exception to the Fourth Amendment's warrant requirement. *United States v. Ross*, 456 U.S. 798, 799 (1982) (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)). Under the automobile exception, if police officers have probable cause that a vehicle contains evidence of a crime, they may conduct a warrantless search of the vehicle without offending the Fourth Amendment. *Id.* at 805. "Probable cause is present when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Graham*, 686 F. App'x 166, 173 (4th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Therefore, when "reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle," probable cause to search the vehicle exists. *United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013) (quoting *United States v. Ortiz*, 699 F.3d 439, 446 (4th Cir. 2012)). Moreover, "the probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *Ross*, 456 U.S. at 808.

Consequently, "the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825. This includes all containers inside the vehicle — open, closed, locked or otherwise —

---

868, 874 (1987)). However, the Fourth Circuit has held that when an individual on federal supervised release is not subject to a warrantless search condition, then officers must have probable cause to conduct a warrantless search. *United States v. Hill*, 776 F.3d 243, 248-49. Defendant correctly notes that, like the supervised release in *Hill*, Defendant's conditions of release do not include a warrantless search condition. (Def.'s Reply at 3;) *Morgan*, 3:06cr494 (ECF No. 100 at 3.) Therefore, the police officers needed probable cause to lawfully search Defendant's car without a warrant.

where probable cause exists that the object(s) of the search may be found within the container.
*Id.*

In *United States v. Baker*, police officers stopped Baker's vehicle because of a broken

taillight and an expired license plate. *Baker*, 719 F.3d at 315. One officer then arrested Baker

upon confirmation that he had an outstanding federal arrest warrant. *Id.* The other officer

arrested Baker's passenger for possession of a handgun, and he discovered drugs, cash and a

digital scale on the passenger's person during his search incident to arrest. *Id.* Based on this

evidence, police searched Baker's vehicle. *Id.* Baker challenged the validity of the warrantless

search of his vehicle under *Gant*. *Id.* at 317-19.

The Fourth Circuit rejected Baker's argument and upheld the search, noting that *Gant* left

"unaltered other exceptions to the warrant requirement that might be relevant in that context,"

including the automobile exception. *Id.* at 319. The court held that probable cause to search a

vehicle exists under the automobile exception "when a police officer lawfully searches a

vehicle's recent occupant and finds contraband on his person." *Id.* (citing *United States v.*

*Johnson*, 383 F.3d 538, 545-46 (7th Cir. 2004)).

Like the officers in *Baker*, the police officers here conducted a lawful search of

Defendant's person incident to his arrest. That search revealed a small baggie containing what

the officers believed to be methamphetamine based on their training and Defendant's own

statements. (Tr. at 88-89.) Indeed, when Officer Douglas asked the other officers about the

quantity, Defendant volunteered that it was a "couple grams." (Officer Myers File at 32:35-

32:38.) Although the police officers had no prior field experience with meth, Officers Douglas

and Myers had received training on the drug. (Tr. at 61-62, 102-03, 134.) Before his arrest,

Defendant had told the officers about his methamphetamine use. He explained that he had failed

to finish his drug treatment program as required by his supervised release. (Officer Myers File at 10:00-10:26.) He told Officer Myers that he "occasionally" still used meth. (Officer Myers File at 10:53-10:59.) Defendant also explained that the underlying conviction for his supervised release related to purchasing methamphetamine by mail. (Officer Eacho File at 17:55-18:12, 26:26-26:48, 27:40-27:45.) He discussed the price of an ounce of methamphetamine with Officer Myers. (Officer Myers File at 26:40-27:50.) Defendant had described methamphetamine as "like a rock form," "like a crystal kind of thing" or a solid that you "then crush up" and sniff. (Officer Douglas File 1 at 28:59-29:34; Officer Myers File at 28:20-28:31.)

Having found contraband on Defendant's person during a lawful search incident to arrest, the officers had probable cause to believe that the truck that Defendant had recently occupied contained further evidence of methamphetamine possession, use and/or distribution. *Baker*, 719 F.3d at 319. Defendant argues that the officers lacked probable cause, because they obtained his statements in violation of *Miranda*. (Mot. to Suppress at 11-16.) However, the rule in *Miranda* "protects against violations of the Self-Incrimination Clause [of the Fifth Amendment], which, in turn is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *United States v. Patane*, 542 U.S. 630, 633 (2004). Therefore, a violation of *Miranda* does not trigger the exclusionary rule — a remedy for Fourth Amendment violations. *Id.* at 637, 643. Consequently, the statements that Defendant made about methamphetamine contributed to the probable cause that the officers had to search his truck without a warrant. Once they discovered the baggie of suspected methamphetamine in Defendant's pants pocket, the officers had probable cause to conduct a warrantless search of the truck under the automobile exception.

Moreover, during that search, the officers could have also searched the safe found within Defendant's truck, because the objects of their search — evidence of methamphetamine-related crimes — could have been located inside the safe. *Ross*, 456 U.S. at 825. However, the officers chose to exercise additional caution upon discovery of the safe, so they obtained a warrant. (Tr. at 95-99.)

The Government also argues that — pursuant to *Gant* — the officers could also rightfully search Defendant's truck without a warrant contemporaneously incident to his arrest. (Gov't's Resp. at 16.) Generally, a search incident to arrest may include "only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence." *Gant*, 556 U.S. at 335 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). In *Gant*, the Supreme Court delineated two circumstances in which that search may extend to vehicles — for purposes of officer safety or preservation of certain evidence. *Gant*, 556 U.S. at 338. First, police may "search a vehicle incident to a recent occupant's arrest . . . when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 343. Second, the *Gant* Court reasoned that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004)).

The Government does not argue that the circumstances of Defendant's arrest triggered the "officer safety" factor of *Gant*, focusing instead on the "evidence preservation" factor. (Gov't's Resp. at 16.) However, the Court disagrees, finding neither *Gant* scenario present in this instance. *United States v. Graham* presents a helpful comparison. 686 F. App'x at 167-68. There, the officer arrested the driver of an illegally parked SUV, Graham, on an outstanding

warrant and placed him in handcuffs. *Id.* The officer then asked Graham whether he had any

weapons on him, to which Graham replied that he had a firearm under the driver's seat of the

SUV. *Id.* at 168. Another officer retrieved the gun, and the officers discovered that Graham was

a felon, later leading to an additional charge. *Id.*

      The Fourth Circuit flatly refused to find the vehicle search reasonable under *Gant*, stating

that the exception "plainly does not apply here." *Id.* at 173. Negating any concerns for officer

safety, the officer had handcuffed Graham and secured him away from the SUV. *Id.* Further,

the officer had no reasonable belief that the vehicle contained evidence of "the crime that was *the*

*basis for his arrest*" — Graham's outstanding arrest warrant. *Id.* (emphasis added).

      Like Graham, Defendant was secured in handcuffs and out of reach of the passenger

compartment when the officers searched his truck. (Officer Myers File 1 at 33:15-33:20.)

Moreover, the officers did not have reason to believe that the truck contained evidence of

Defendant's outstanding arrest warrant. Defendant had told the officers that the warrant might

stem from his failure to complete a drug treatment program. (Officer Myers File at 10:00-

10:15.) Later, once the officers had transported Defendant to lockup, they also charged him with

a state crime for possession with intent to distribute a Schedule I or II substance. (Tr. at 102.)

But that had no effect on the basis for the arrest — the outstanding warrant for Defendant's

violation of supervised release. Thus, the *Gant* exceptions do not apply here. Nonetheless, as

stated above, the warrantless search of Defendant's truck remained permissible under the

automobile exception.

    **E. The Search Warrant and Defendant's *Franks* Motion.**

      Finally, Defendant attacks the search warrant that the officers used to perform the second

search of Defendant's truck and the only search of the locked safe therein. (Mot. to Suppress at

16-19; Def.'s Reply at 10-11.)  Specifically, Defendant argues that (1) once stricken for

Defendant's statements and/or (2) considering the information that Officer Eacho omitted, the

affidavit in support of the search warrant lacked probable cause.  (Mot. to Suppress at 18-19.)  In

response, the Government argues that probable cause supported the search warrant, even without

Defendant's statements.  (Gov't's Resp. at 19-20.)  Moreover, the Government avers that

Defendant failed to show that Officer Eacho omitted any information from the affidavit with the

requisite intent to mislead.  (Gov't's Resp. at 20.)  Finally, the Government argues that the police

officers relied on the search warrant in good faith.  (Gov't's Resp. at 20.)

After the issuance of a search warrant, courts show great deference to the judicial

officer's probable cause determination.  *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir.

1990).  The Court has reviewed the four corners of the search warrant that the state magistrate

issued here and finds that it contained adequate probable cause for issuance.

Even if the search warrant lacked probable cause to issue, the officers had a good faith

basis to rely on the warrant.  Under, the good faith exception to the warrant requirement, courts

will not suppress evidence obtained pursuant to an invalidated search warrant unless "a

reasonably well-trained officer . . . [should] have known that the search was illegal despite the

magistrate's authorization."  *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).  Thus, the

good faith exception does not apply if "the officers were dishonest or reckless in preparing their

affidavit or could not have harbored an objectively reasonable belief in the existence of probable

cause."  *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (quoting *Leon*, 468 U.S. at

926).

Here, as stated above, the officers articulated why they believed that they had probable cause to search the truck.[5] After the search incident to arrest revealed the baggie of methamphetamine in Defendant's pants pocket, Officer Myers believed that they had probable cause to search the truck that Defendant had recently occupied. (Tr. at 94.) Specifically, Officer Myers thought that the truck could contain "additional packaging materials, cell phones [or other] electronic equipment used in the selling or distribution of [methamphetamine], and also any type of proceeds from the sale of that narcotic." (Tr. at 94.) Indeed, only the presence of the locked safe gave Officer Myers pause to stop and obtain a warrant. (Tr. at 95.) But in fact, as noted above, the probable cause to search the truck would have permitted the officers to search the safe as well.

Similarly, Officer Douglas believed that the discovery of methamphetamine in Defendant's pocket — combined with Defendant's evasiveness and the interest that passersby showed in taking the truck — gave them probable cause to search the truck. (Tr. at 36-37.) And like Officer Myers, Officer Douglas cited their discovery of the safe in the backseat area of the truck as the reason that the officers stopped their initial search and obtained a warrant. (Tr. at 43-47.) The officers' testimony demonstrates their good-faith belief that probable cause existed for them to search the truck even before they obtained a warrant. After the warrant issued, their good faith reliance continued with the assurance that they could then search the safe as well. On these facts, a reasonable officer in the officers' shoes would not have deemed this search illegal.

---

[5]     While Officer Eacho wrote the affidavit, Officers Myers and Douglas executed the search warrant on Defendant's truck and the safe. (Tr. at 131.)

### 1.  Officer Eacho Properly Included Defendant's Statements in the Affidavit.

Defendant urges the Court to strike the statements that he made to the police officers

from Officer Eacho's affidavit.[6]  (Mot. to Suppress at 17-18.)  Defendant argues that without

those statements, the affidavit could not support a probable cause finding.  (Mot. to Suppress at

17-18.)  Defendant cites to *United States v. Saafir*, 754 F.3d 262 (4th Cir. 2014), and *United*

*States v. Gillenwaters*, 890 F.2d 679 (4th Cir. 1989), for support.  (Mot. to Suppress at 17-18;

Def.'s Reply at 10.)  The Court finds both cases inapposite to the instant matter.

In *Saafir*, a police officer asked for consent to search the car that Saafir had been driving

when the officer pulled him over for speeding and over-tinted windows.  754 F.3d at 264-65.

Saafir refused.  *Id.* at 265.  The officer persisted, telling Saafir that he already had probable cause

to search the car, because he saw a "hip flask commonly used to carry alcohol" in the driver-side

door.  *Id.*  Though Saafir never consented to the search, he eventually told the officer that there

"might" be a gun under the seat in the car.  *Id.*  Based on that statement, the officers searched the

car, finding some marijuana but no gun.  *Id.*  The Government conceded that the officer did not

in fact have probable cause to search the car, because he made no effort to determine the contents

of the flask and he had no other evidence of Saafir's intoxication.  *Id.* at 266.

The Fourth Circuit held that "the officer's *false assertion* of his authority to search the car

irreparably tainted Saafir's incriminatory statements and the ensuing search of the car."  *Id.*

(emphasis added).  Because the officer had "manufacture[d] probable cause by unlawful means,"

---

[6]        The affidavit contains four statements made by Defendant:  (1) post-*Miranda*, Defendant
identified the substance recovered from his pants pocket as methamphetamine; (2) when asked
about its quantity, he stated "about 2 grams;" (3) he made statements about the inconsistency of
that amount with personal use; and, (4) he stated that a typical use would use roughly a quarter of
a gram at a time.  (Gov't Ex. 1 at 5.)

he could not use Defendant's statement as probable cause "to support an *otherwise illegal search*." *Id.* (emphasis added).

Here, the officers did not make false assertions that they had probable cause when they did not. While awaiting confirmation of the warrant, Officer Douglas explained to Defendant that if they confirmed the warrant, then the officers would search him. (Officer Myers File at 07:15-07:24.) Observing Defendant's nervousness, Officer Myers later added that the officers would more than likely tow his truck if they had to arrest him on the outstanding warrant. (Officer Myers File at 08:44-09:00.) If they towed the truck, Officer Myers reasoned that he would have to inventory the truck and discover any contraband within it. (Officer Myers File at 08:52-09:06.) Finally, after the search incident to arrest, Officer Myers stated that he was going to start searching the truck, because Defendant exited the truck with methamphetamine on his person. (Officer Myers File 1 at 33:15-33:20.)

Unlike the officer's statement in *Saafir*, Officer Myers' statements ring true. 754 F.3d at 265-66. Once they confirmed the warrant, the officers would arrest Defendant and search his person incident to the arrest. If the officers towed the truck, they would perform an inventory to account for its contents. And when Officer Myers announced that he would begin searching the truck, he in fact had probable cause to do so. Officer Myers did not falsely assert that he had probable cause when he in fact lacked it. Moreover, unlike Saafir, Defendant never gave up the fact that he had any contraband in his truck. Finally, unlike the search in *Saafir*, the warrantless search of Defendant's truck was actually lawful. *Id.* Thus, *Saafir* does not mandate striking any of Defendant's statements used in the affidavit for the search warrant.

Similarly, Defendant wrongly relies on *Gillenwaters*. There, an officer illegally searched a home by following Gillenwaters around her house while she looked to see if anything had been

stolen. 890 F.2d at 680. Another officer prepared an affidavit that included information obtained during the illegal search. *Id.* at 680-81. The district court set aside "all information [that the first officer] might have obtained by conducting an unauthorized search," and found that the redacted affidavit still supported a probable cause finding. *Id.* at 682. The Fourth Circuit affirmed. *Id.* at 682-83.

The Court's previous analysis forecloses any guidance that *Gillenwaters* might provide in this case. Unlike the initial search in *Gillenwaters*, the initial searches here — of Defendant and his truck — have a lawful basis. *Id.* And as stated above, without a Fourth Amendment violation, the officers could use Defendant's statements to inform whether they had probable cause to search. *Patane*, 542 U.S. at 637, 643. Finding no reason to strike Defendant's statements from the affidavit, the Court turns to Defendant's argument that Officer Eacho impermissibly omitted material information from the affidavit. (Mot. to Suppress at 17-19.)

### 2. Defendant Fails to Show that the Information Omitted from the Affidavit Entitles him to a *Franks* Hearing.

"In *Franks v. Delaware*, 438 U.S. 154 . . . (1978), the Supreme Court held that in certain narrowly defined circumstances a defendant can attack a facially sufficient affidavit." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). Recognizing a "strong 'presumption of validity with respect to the affidavit supporting the search warrant,'" the *Franks* Court fashioned a rule of "limited scope." *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 167, 171 (1978)). To obtain an evidentiary hearing under *Franks*, Defendant must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." *Id.* First, Defendant "must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56 (quotations omitted) (the "intentionality prong"). The

defense must set forth more than a conclusory showing, and it must include "a detailed offer of proof." *Colkley*, 899 F.2d at 300 (citing *Franks*, 438 U.S. at 171). Second, the offending information must be essential to the probable cause determination. *Franks*, 438 U.S. at 171-72 (the "materiality prong").

The Fourth Circuit has extended *Franks* to intentional, material omissions from affidavits as well. *Colkley*, 899 F.2d at 300-02. However, the Fourth Circuit cautioned that "the affirmative inclusion of false information in an affidavit" would more likely invalidate a warrant than would an omission. *Id.* at 301. Moreover, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id.* at 300.

To satisfy the requisite showing of intentionality, a defendant must show that the omissions were "*designed to mislead,*" or were made with "*reckless disregard of whether they would mislead,*" the magistrate. *Id.* at 301 (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)). This places an even higher threshold under *Franks* for a defendant "making claims of omissions rather than affirmative false statements." *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011) (citing *United States v. Tate*, 524 F.3d 449, 454-55 (4th Cir. 2008)). For example, omissions of potentially exculpatory information do not establish intentionality where a defendant made no showing that the affiant-agent had the requisite intent to mislead the magistrate. *Colkley*, 899 F.2d at 301 (finding agent at worst negligent where he omitted that six eyewitnesses could not positively identify the defendant in a photospread); *see also United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011) (finding omission of witness impeachment information not intentional where the officers lacked actual knowledge of the omitted information). Conversely, omitting information that shows the unreliability of an informant — while continuing to rely on that informant for other purposes in the affidavit — constitutes an

intentional omission, because "deeming [an] informant reliable for some purposes but unreliable for other is an assessment . . . for the magistrate, not [the affiant], to make." *United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016).

To satisfy the materiality prong under *Franks*, "an omission . . . must be 'necessary to the finding of probable cause,'" such that its inclusion would destroy probable cause. *Colkley*, 899 F.2d at 301 (quoting *Franks*, 438 U.S. at 156). To make this determination, courts again apply the totality of the circumstances test. *Id.* (additional citation omitted). If — upon inclusion of the omitted material — a sufficient basis for the probable cause finding still exists, then the defendant has failed to show the materiality of the omission. *Blauvelt*, 638 F.3d at 289-90; *United States v. Clenney*, 631 F.3d 658, 666 (4th Cir. 2011); *Colkley*, 899 F.2d at 301-02. However, when the omissions relate to an informant's reliability, for example, the magistrate could not properly consider any of the informant's statements. *Lull*, 824 F.3d at 118. If the affidavit fails to provide a basis for finding probable cause after excluding those statements statements, then the omitted information would be deemed material to the finding. *Id.*

Here, Defendant claims that Officer Eacho's affidavit in support of the search warrant omitted four important pieces of information: (1) that the officers had no previous personal experience with methamphetamine or personal knowledge related to its distribution; (2) that the officers saw no contraband in plain view when they peered into Defendant's truck; (3) that the warrantless search of the truck yielded no evidence related to methamphetamine; and, (4) that the drug dog alerted to methamphetamine in the truck after the officers placed the baggie of methamphetamine inside the truck. (Mot. to Suppress at 18-19.)

The Court first considers whether Defendant has made a threshold showing that Officer Eacho omitted this information to intentionally mislead, or with reckless disregard of whether it

would mislead, the state magistrate.  He has not.  Defendant lists the four omissions that he

argues cast a fatal blow to the search warrant, and then immediately concludes that they

"demonstrate at the very least a reckless disregard for the truth."  (Mot. to Suppress at 19; *see*

*also* Def.'s Reply at 11 (after listing the omissions, stating only that "[t]here is substantial

evidence before the Court that Officer Eacho omitted this information with at least reckless

disregard for the truth.").  His argument ends there.  This constitutes precisely the sort of

conclusory showing that the Fourth Circuit has rejected, and it fails to approach the "detailed

offer of proof" that the test demands.  *Colkley*, 899 F.2d at 300 (citing *Franks*, 438 U.S. at 171).

Indeed, Defendant could have attempted to establish reckless disregard by "proffering 'evidence

that a police officer failed to inform the judicial officers of facts [he] knew would negate

probable cause,'" but he did not.  *Lull*, 824 F.3d at 117 (quoting *Miller v. Prince George's Cty.*,

475 F.3d 621, 627 (4th Cir. 2007) (alteration in original)).

 Likewise, the record bares no evidence that Officer Eacho omitted information from his

affidavit with even reckless disregard that doing so might mislead the magistrate into finding

probable cause where none existed.  On cross-examination, the defense asked Officer Eacho

whether he orally told the magistrate about his lack of experience with methamphetamine, the

lack of contraband seen in the truck by the other officers upon a plain view inspection, as well as

the fact that the initial search of the truck yielded no evidence of distribution.  (Tr. at 133-35.)

Officer Eacho responded in the negative to each question.  (Tr. at 133-35.)  Yet, Defendant's

questioning went no further.  The defense did not ask Officer Eacho *why* he did not tell the

magistrate these three pieces of information.  Nor did the defense ask him whether he mentioned

the dog sniff to the magistrate at all.[7]  Thus, Officer Eacho's testimony in this regard did not add

to or detract from the information actually contained in the affidavit.  Because Defendant has not

made the requisite showing of intent to mislead, a *Franks* hearing is not necessary.

Nonetheless, the Court will consider whether any of the omissions outlined by Defendant

satisfy the materiality prong of *Franks*.  Under this test, the Court must consider the totality of

the circumstances as if the omissions had been included in Officer Eacho's affidavit.  *Colkley*,

899 F.2d at 301-02.  First, despite the officers' lack of experience with methamphetamine, the

magistrate could rely on the fact that Defendant had confirmed (1) that the crystalline white

substance was methamphetamine, (2) its approximate weight as approximately two grams, and

(3) that a typical user used only about a quarter of a gram at a time.  (Gov't Ex. 1 at 5.)  Also,

Officer Eacho relayed his experience that a user of any Schedule I or II substance would not

carry such a large quantity of drugs or hundreds of dollars in cash at once.  (Gov't Ex. 1 at 5.)

Second, it does not defeat the probable cause finding that both the plain view inspection and the

warrantless search of the truck yielded no evidence of distribution.  The officers arrested Morgan

on an outstanding federal warrant, and during the search of his person incident to arrest, they

---

[7]         In fact, only Officer Myers testified in detail about the dog sniff.  (Tr. at 88, 92-94.)
Officer Myers explained that the K-9 unit arrived on the scene after the officers had discovered
the baggie of methamphetamine on Defendant's person but before the warrantless search of the
truck.  (Tr. at 88, 92.)  By that time, Officer Myers believed that the officers "already had
probable cause to get in the vehicle," so he felt that they no longer needed the dog sniff.  (Tr. at
93-94.)  However, because the K-9 unit had traveled across the city in response to the officers'
call, the officers on the scene invited the K-9 officer to "run [his] dog anyway" and reward the
dog for good work.  (Tr. at 92-93.)  This negates any suggestion that Officer Eacho sought to
mislead the magistrate by omitting the dog sniff.  Quite the opposite, this testimony establishes
that the dog sniff was conducted as a training/reward exercise for the dog and not to establish
probable cause to search the truck.  Indeed, to *include* that information in the affidavit could have
misled the magistrate to improperly rely on the dog sniff as a basis for the probable cause
determination.  Thus, the record shows that Officer Eacho had a legitimate reason for this
omission.  *Clenney*, 631 F.3d at 665 (finding no intentionality showing where officer had
legitimate reasons for his omissions).

recovered a baggie with a sizable quantity of suspected narcotics. (Gov't Ex. 1 at 5.) The presence of the controlled substance that the officers discovered during a lawful search established probable cause to search the truck. Finally, to include the dog sniff alert — without explanation — would have been misleading by Officer Eacho. Had he explained that the officers allowed the K-9 unit to run the dog for purposes of training and reward, Officer Eacho would not have added to nor detracted from his basis for probable cause.

To require Officer Eacho to include these omissions would require him "to include in an affidavit every piece of information gathered in the course of [his] investigation" — but that is not the test. *Colkley*, 899 F.2d at 300. Viewing the affidavit as a whole, the omissions from the affidavit were not necessary to the finding of probable cause. Because Defendant has not made a sufficient showing of intentionality and materiality, the Court deems a *Franks* hearing on the matter unwarranted.

## IV.    CONCLUSION

For the reasons set forth above, the Court recommends that Defendant's Motion to Suppress (ECF No. 6) be GRANTED IN PART and DENIED IN PART. The Court recommends that the Motion be granted to the extent that it seeks to suppress all of the statements that Defendant made to the police officers on September 22, 2017, as well as the electronic devices recovered from Defendant's truck and their contents. To the extent that Defendant seeks to suppress the remainder of the physical evidence, the Court recommends that the Motion be denied.

Let the Clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  July 2, 2018